ALEXANDER DUMAS v. THE CHESAPEAKE AND OHIO RAILWAY
COMPANY.

(Filed 14 December, 1960.)

**1. Process § 12— Evidence that foreign corporation was doing business
in this State held sufficient to support service on resident agent.**

Evidence to the effect that a foreign railroad corporation, maintain-
ing no trackage within the State, did maintain three agents in this
State at fixed places of business, that the agent upon whom process
was served not only solicited freight by seeking to have shipments from
points within the State, and also shipments from points outside the State
to points within the State, routed so as to use the facilities of his com-
pany, but also that the agent had some discretion in determining which
shipments would be profitable and should be sought, and that, upon re-
quest for passenger accommodations, he consummated the request by
telephoning his company's passenger department in another state and ar-
ranging that the requested tickets should be left with the ticket agent
at a specified place for the passenger, *is held* sufficient to sustain the
court's findings that the nonresident railroad company was doing busi-
ness in this State within the purview of G.S. 1-97, and that the agent
was not merely procuring orders which had to be accepted out of the
State before becoming binding contracts, G.S. 55-131 (B) (5), and service
on such agent is valid. *Lambert v. Schell,* 235 N.C. 21, cited and dis-
tinguished.

**2. Same:   Constitutional Law § 20—**

Whether a foreign corporation is doing business in North Carolina so
as to suject it to the jurisdiction of the State's Courts is essentially a
question of due process of law under the 14th Amendment to the Federal
Constitution, which must be decided in accord with the decisions of the
U. S. Supreme Court.

APPEAL by defendant from *Gwyn, J.,* February Civil Term, 1960,
of GUILFORD — High Point Division.

Civil action by a resident of Guilford County to recover damages
for personal injuries sustained on 29 August 1959 in a collision be-
tween a tractor semi-trailer unit, in which plaintiff was a helper, and
a train of defendant on a grade crossing near Madison, West Vir-
ginia, heard on motion made by defendant, on special appearance,
to dismiss for want of service of summons.

This motion was heard by Judge Gwyn, who by consent of counsel
deferred his decision to a subsequent term. At the Special September
Term, 1960, Judge Gwyn entered on 6 September 1960 the following
order:

"From all the evidence the court is of the opinion, finds as a fact,
and, therefore, holds that the defendant maintains offices in the State
of North Carolina, that William Hudson Trent is manager of defend-

ant's office at Winston-Salem, N. C., that service of summons in this action was had upon said William Hudson Trent, defendant's agent, that the activities of defendant in North Carolina consisted at the time of the bringing of this suit and still consist of more than 'soliciting or procuring orders where such orders require acceptance without the state before becoming binding contracts,' as contemplated by Section 55-131(B)(5) of the General Statutes; that the conduct of defendant constituted transacting business within North Carolina.

"It is now, therefore, ordered and adjudged that the service of summons and complaint in this action by the Sheriff of Forsyth County on W. Hudson Trent, General Agent for defendant, constitutes a valid legal service of summons and the motion to dismiss is accordingly denied."

From this order defendant appeals.

*D. C. MacRae and Julian Franklin for plaintiff, appellee.*
*James B. Lovelace for defendant, appellant.*

PARKER, J. The Chesapeake and Ohio Railway Company, hereinafter called the company, is a Virginia corporation with its legal domicile and principal office in the city of Richmond, Virginia. The summons in this action was issued on 14 January 1960 by the clerk of the Superior Court of Guilford County, and served 15 January 1960 on "Mr. William Hudson Trent, general agent Chesapeake and Ohio Railway Co." by the sheriff of Forsyth County.

In support of its motion the company offered in evidence the affidavits of T. H. Keelor, its secretary, and of William Hudson Trent, who resides in the city of Winston-Salem, North Carolina, and is an employee of the company in the traffic department, and is designated a general agent. Plaintiff's evidence consists of the testimony of William Hudson Trent, who was called by plaintiff as a witness.

These facts appear from the evidence: The company operates a railway system through the States of Virginia, West Virginia, Kentucky, and northward, but has no railway lines or tracks, nor does it operate any trains, cars, or other equipment in, on, or across the State of North Carolina. The company has in its employ in North Carolina as its agents William Hudson Trent, who is in charge of an office maintained by the company in the Reynolds Building in Winston-Salem, A. G. Daughtrey, who is in charge of an office maintained by the company in the Liberty Life Building in Char-

lotte, and W. F. Michie, who is in charge of an office maintained
by the company in the Insurance Building in Raleigh. William
Hudson Trent has a secretary in the office employed by the com-
pany. This office was opened about 1924. The name of the company
appears on the door of the office, and the company's name appears
in the building directory. The company's name appears in the Win-
ston-Salem Telephone Directory. The furniture in the office is own-
ed by the company, and is listed for taxes at about $350.00. A. G.
Daughtrey has working under his direction in the office in Charlotte
one or more persons employed by the company to assist him in per-
forming his duties. The same is true as to W. F. Michie. A. G. Daugh-
trey and W. F. Michie are designated general agents. The company
paid William Hudson Trent a salary for the year 1959 of $9,072.00
by cheque from Huntington, West Virginia. The salaries of A. G.
Daughtrey and W. F. Michie closely approximate the same amount.
The salaries of the office employees and the rentals on the offices
are paid by cheques of the company from outside of North Carolina.
The company does not have, and never has had, a bank account in
North Carolina. No employee of the company collects any money in
North Carolina for it.

The company publishes through rates with North Carolina carriers.
William Hudson Trent testified: "My business is selling the com-
modity that The Chesapeake and Ohio Railway Company has to
sell, which is transportation. We do not serve Cleveland. We serve
Chicago. If I heard of a proposed shipment of a carload of knitted
goods by P. H. Hanes Knitting Company from Winston-Salem, con-
signed to Chicago, I would endeavor to have the Traffic Manager at
Hanes Hosiery or whoever the shipper might be route in connection
with our line. He would probably route the shipment Southern Rail-
way to Louisville, Kentucky, then to Chicago, and The Chesapeake
and Ohio Railway Company would not be involved. There would be
several routes available to him, and the most feasible route for my
company to participate in would be over the Southern Railway Com-
pany to Lynchburg, Virginia, and over the Chesapeake and Ohio Rail-
way Company from Lynchburg, Virginia, to destination. The bill of
lading would be signed by Southern Railway. The revenue would be
computed according to tariffs to cover the entire haul. The through
rate would be based on the rate published and applicable tariffs at that
time. My company would take the shipment in Lynchburg and take
it to destination and deliver it. If it is a collect shipment, Chesapeake
and Ohio Railway Company would collect the freight charges at

destination. Then in our inter-line settlements we would pay the Southern Railway Company its portion of the revenue, probably sending it to their auditor in Atlanta. Out of that haul the Chesapeake and Ohio Railway Company would derive its portion of the revenue. . . . I would say within my territory which embraces northern, central North Carolina and southern Virginia, that we would handle a total tonnage of 1400 cars a month. How many of those may originate or terminate within the State of North Carolina, I couldn't estimate. That covers my general territory of which I have charge or jurisdiction. I have no idea as to the freight revenue derived from that, as I receive nothing in the way of revenue on cars involved. . . . I sell no passenger traffic whatsoever, no tickets, accept no monies. The manner in which I handle passenger traffic is when I have a request for it, I have to phone our Passenger Department in Richmond, Virginia, and tell them what is desired in the way of accommodations and train schedules, and ask them to leave it at whichever one of our ticket agents that the party here in North Carolina may be — at the point where he would board the train. Quite frequently, it is Clifton Forge. . . . If I find that there is a most desirable shipment coming to North Carolina from a point where my company originates, I would seek that business if the competition was involved. If it was a desirable piece of business, I surely would seek it. If there is such a case as that, we could be the originating carrier, and some other carrier would be the delivering carrier in North Carolina. The revenue would be received prepaid or collect and divided between the two carriers on the basis of I. C. C. approved division sheets. My job is to seek the most lucrative business in North Carolina, whether it is ingoing or outgoing. That is Mr. Daughtrey's and Mr. Michie's job also. I get the business here in North Carolina so that my road can take it somewhere else to another point and derive the revenue out of freight originating here consigned to North Carolina, but only through tariffs approved by the Commission. We hold ourselves out as a common carrier by rail."

The company has not qualified to do business in North Carolina by compliance with the applicable statutes.

This question is presented for decision: Is the defendant company doing business in North Carolina through an agent in the State?

Defendant contends that we held in *Lambert v. Schell*, 235 N.C. 21, 69 S.E. 2d 11, that a corporate defendant doing identical acts as the corporate defendant here was not doing business or maintaining a local agent within this State so as to render it amenable to process issued in the case.

In the *Lambert* case and in the instant case, the corporate railway defendants neither own, lease or operate any line of railway nor any transportation facilities within the State of North Carolina. In the *Lambert* case the judge found that the corporate defendant's activities consist "of the solicitation of freight and passenger business originating in or destined to points in North Carolina, which in the course of interstate and transcontinental transportation will be routed so as to move over the lines of the Union Pacific Railroad Company while within the general territory in which the lines of said company are located." In the *Lambert* case the summons was served on David R. Walker as passenger and travelling freight agent of the corporate defendant. Walker maintained offices in Winston-Salem, and as to his activities the court found the following facts: His "duties and business as such agent and representative were to cultivate good will among manufacturers' representatives in Western North Carolina and other points for and on behalf of said Union Pacific Railroad Company, with a view and purpose of inducing the routing or shipment of freight from such manufacturers over the lines of said Union Pacific Railroad Company, to solicit business for said railroad, to adjust grievances, and generally to conduct the business of said railroad in this state."

The facts in the instant case are far from being indentical with the facts in the *Lambert* case. In the instant case we have more than the mere solicitation of freight and passenger traffic by defendant's agent Trent. For instance, when he has a request for passenger traffic, he phones the company's passenger department in Richmond, Virginia, and tells them what is desired in the way of accommodations and train schedules, and asks them to leave these things with a ticket agent of the company where the passenger will board one of defendant's trains. In other words, Trent in North Carolina consummates the request or the successful solicitation of passenger traffic. Further, if he is successful in the solicitation of freight traffic, and the Southern Railway Company carries the goods to Lynchburg, Virginia, and the defendant company carries the goods to their destination, the bill of lading is signed by Southern Railway Company in North Carolina, and the through rate is based on the published rate and applicable tariffs at that time, and the defendant company in North Carolina publishes through rates with North Carolina carriers. Such activities are a regular, continuous and sustained course of business by Trent in North Carolina for defendant company, so that in Trent's territory the defendant company, in his words, "would handle a total tonnage of 1400 cars a month." This must be some

substantial part of the ordinary business of defendant corporation. The evidence does not disclose the tonnage in Daughtrey's and Michie's territory, but it must be considerable, because they are paid approximately the same salary as Trent. All of this constitutes in the practical sense, both doing business and engaging in business in North Carolina, and should do so in a legal sense.

The Court very aptly said in *Frene v. Louisville Cement Co.*, 134 F. 2d 511, 516: "Solicitation is the foundation of sales. Completing the contract often is a mere formality when the stage of 'selling' the customer has been passed. No business man would regard 'selling,' the 'taking of orders,' 'solicitation' as not 'doing business.' The merchant or manufacturer considers these things the heart of business."

In *Green v. Chicago, B. & Q. R. Co.*, 205 U.S. 530, 51 L. Ed. 916, it was held that "mere solicitation" by a railroad company of freight and passenger business within the State did not constitute doing business there so as to permit the State to subject the railroad to *in personam* jurisdiction. "While never overruled, later cases from the Supreme Court and a number of lower court opinions drastically curtailed this doctrine, (in the *Green* case), and held that solicitation coupled with slight additional activities of the corporation in a jurisdiction has been held to subject the corporation to personal service of process." Fletcher, Cyclopedia of the Law of Private Corporations, 1955 Revised Vol. 18, p. 479.

Recent decisions of the United States Supreme Court have greatly expanded the concept of a State's jurisdiction over nonresident defendants and foreign corporations. *International Shoe Co. v. Washington*, 326 U.S. 310, 90 L. Ed. 95, 161 A.L.R. 1057; Anno. U. S. Supreme Court Reports, 96 L. Ed. 495 *et seq.*

In evaluating the decisions of the United States Supreme Court dealing with the question as to what facts are sufficient, or not sufficient, to support the power of the forum to subject a foreign corporation to a suit *in personam*, it must be kept in mind that the fundamental test has undergone a substantial change in *International Shoe Co. v. Washington, supra*, which in lieu of the former theories of "implied consent," "presence," or "doing business" introduces the "minimum contacts" test and the "fair play and substantial justice" rule, and this rule has been followed in subsequent cases like *Travelers Health Ass'n. v. Com. of Virginia*, 339 U.S. 643, 94 L. Ed. 1154; *Labonte v. American Mercury Magazine*, 98 N.H. 163, 96 A. 2d 200, 38 A.L.R. 2d 742, with elaborate annotation in A.L.R., pp. 747 *et seq.; Smyth v. Twin State Improvement Corp.*, 116 Vt. 569, 80 A. 2d 664, 25 A.L.R. 2d 1193.

In the *International Shoe* case appears the following dictum: "While it has been held, in cases on which appellant relies, that continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity, (citing authorities), there have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."

A subsequent decision of the United States Supreme Court made the dictum law. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 96 L. Ed. 485.

In *International Harvester Co. v. Kentucky*, 234 U.S. 579, 58 L. Ed. 1479, the Court in reference to its former decision *Green v. Chicago, B. & Q. R. Co., supra*, stated it had no desire to depart from that decision, which, however, it said "was an extreme case."

"Solicitation of business aided by other manifestations of corporate presence will warrant the conclusion that a foreign corporation is doing business in the State not withstanding none of such manifestations is singly capable of carrying the weight of such inferences." 20 C.J.S., Corporations, p. 167.

The Court said in *Putnam v. Publications*, 245 N.C. 432, 96 S.E. 2d 445: "Whether a foreign corporation is doing business in North Carolina, so as to subject it to the jurisdiction of the State's Courts, is essentially a question of due process of law under the U. S. Constitution, Amendment 14(1), which must be decided in accord with the decisions of the U. S. Supreme Court. *Harrison v. Corley*, 226 N.C. 184, 37 S.E. 2d 489; *American Asphalt Roof Corp. v. Shankland*, 205 Iowa 862, 219 N.W. 28, 60 A.L.R. 986 (where many cases are cited)."

It appears from Trent's testimony that he had some measure of control over the company's business and was empowered to exercise some discretion with respect to it, for he testified, "if I find that there is a most desirable shipment coming to North Carolina from a point where my company originates, I would seek that business if the competition was involved," and "my job is to seek the most lucrative business in North Carolina, whether it is ingoing or outgoing." This permits the fair inference that if Trent, in his judgment and discretion, does not consider business profitable to his company he is empowered not to seek it.

Considering the activities of defendant's agents in North Carolina as a whole, and not as isolated acts, we are of the opinion, and so hold, that their activities for their company are so regular, continu-

ous, sustained, and substantial, and of such a nature as to constitute within the intent and meaning of G.S. 1-97 an engaging or doing of business in this State, through agents in this State, so as to give to the courts of this State jurisdiction over defendant for the cause of action here alleged to have occurred in the State of West Virginia, and to make defendant company amenable to process issued by such North Carolina courts.

Of course, there may be inconvenience to the defendant company to hold it amenable to suit in the State of North Carolina by a resident of North Carolina for an alleged cause of action originating in the State of West Virginia, but certainly nothing which amounts to a denial of due process. The summons was served on defendant's agent, it has knowledge of the action because the defendant company is represented by its attorney here in the instant case, and has a reasonable time after this appeal is decided to file answer and defend on the merits. Cf. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 2 L. Ed. 2d 223.

Defendant's assignment of error to this finding of fact by the court "the activities of defendant in North Carolina consisted at the time of the bringing of this suit and still consists of more than 'soliciting or procuring orders where such orders require acceptance without the state before becoming binding contracts,' as contemplated by Section 55-131(B)(5) of the General Statutes" is overruled. The other assignments of error of defendant are overruled.

The judge's findings of fact are supported by competent evidence, and they support his conclusions, and order based thereon. The order appealed from is

Affirmed.